UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NICHOLE R. BROWN,

                Plaintiff,

v.                                         Case No.  5:05-cv-68-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                Defendant.
_____

## ORDER

     Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her application for a period of disability, disability

insurance benefits, and Supplemental Security Income. (Doc. 15.) The Commissioner

has answered (Doc. 4), and both parties have filed briefs outlining their respective

positions. (Doc. 15 & 21.) For the reasons discussed below, the Court finds that the

Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

     Plaintiff filed her application for disability insurance benefits and Supplemental

Security Income protectively on May 8, 2002, alleging an onset date of November 17,

2001. (R. 43-45, 211-213.) Her claim was denied initially and upon reconsideration.  (R.

27, 30-31, 34, 216, 220.) Plaintiff requested a hearing before an Administrative Law

Judge, which was held on June 8, 2004. On August 6, 2004, following the hearing,

Administrative Law Judge Frank D. Armstrong (the "ALJ") issued a decision unfavorable

to Plaintiff. (R. 13-19.) Plaintiff's request for review of that decision was denied by the

Appeals Council on November 26, 2004, rendering the ALJ's decision the final decision

of the Commissioner. (R. 5.)

## II.  ISSUES PRESENTED

The Plaintiff raises primarily two issues on appeal. First, Plaintiff contends that

there was no valid waiver of her right to counsel and she was prejudiced because the

ALJ failed to develop the record by not obtaining objective testing of her intellectual

functioning. Plaintiff asserts that had she been represented by counsel and had the ALJ

obtained the intellectual functioning test, she would have met the Listing under 12.05C.

Second, Plaintiff contends that the ALJ erred in failing to consider Plaintiff's headaches

and degenerative lumbar spine disorder at step two of the sequential analysis and at

step four in his RFC analysis by failing to properly assess Plaintiff's subjective

complaints of pain under the Eleventh Circuit pain standard.

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the

---

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back

---

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:
> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.")

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

to the claimant to show that he or she is not capable of performing the "other work" as

set forth by the Commissioner.

## IV. SUMMARY OF THE RECORD

### A. Personal and Occupational Background

Plaintiff was twenty-seven years old at the time of the hearing. (R. 17.) Due to the

injuries she sustained in a car accident, her four children now live with her mother, and

Plaintiff has been living with her mother and other relatives. Prior to the accident, she

had worked as a cook and cashier at a Hardee's restaurant and as a lab technician in

animal resources at Shands at the University of Florida. (R. 66, 97, 99, 232.) As a cook,

Plaintiff was required to stand and walk for seven to seven and one-half hours in an

eight hour shift. She sat for about one half hour and spent about one hour in a stooped

position. The heaviest objects she lifted in this job weighed ten pounds, but she

frequently lifted objects weighing less than ten pounds. (R. 67.) In animal resources, her

job required her to provide food and water to the animals as well as to clean out their

cages. (R. 76, 232-33.) She noted that she spent four to seven hours walking or

standing in this job, one to two hours sitting, one to two in a stooped position and one

hour in a crouched position. (R. 68, 76.) The heaviest weight she lifted in this job was

twenty pounds, but she frequently lifted objects weighing ten pounds.  (R. 68.)

### B. Lumbar Spine Disorder and Headaches

#### 1. Objective and Medical Opinion Evidence

After her motor vehicle accident on November 17, 2001, Plaintiff was admitted to

the hospital for treatment of multiple injuries. It was noted that she had leg incisions

consistent with prior hip surgeries. (R. 101.) CT scans revealed that Plaintiff had

transverse process fractures at L3 and L4 and vertebral fractures. (R. 101-102, 124.) The CT scans of Plaintiff's head were repeatedly negative. In physical therapy, it was noted that Plaintiff had a left-sided weakness, but an MRI "showed no evidence of cord compression" and an EEG showed only mild frontal swelling. (R. 102.) No fractures were revealed by x-ray, and there was no evidence of deep venous thromboses. (R. 103.) Plaintiff was discharged to Shands Inpatient Rehab Facility for physical therapy and cognitive and neuropsychological therapy. (R. 103.) It was noted that upon discharge, Plaintiff needed assistance ambulating, was not to lift more than five pounds, nor engage in strenuous activity until cleared by a physician. (R. 103.)

On November 29, 2001, Dr. Rout ordered additional imaging of Plaintiff's spine due to the presence of weakness, spasticity,[21] hyperreflexia, and Babinski sign.[22]  He recommended cessation of Plaintiff's physical and occupational therapy. (R. 105.) The doctor noted no sensory impairment. (R. 106.) It was recommended that Plaintiff have supervision at home because she needed continued assistance and/or supervision with standing and walking. (R. 117-18.) She had decreased balance when standing, but good balance sitting. (R. 108.) It was noted she needed little to no assistance with her activities of daily living. (R. 109.) At the time of discharge it was recommended that Plaintiff schedule follow up visits with Dr. Scott-Okafor for rehabilitation, Dr. Fielding for Neurology as needed, and her primary care provider in two weeks. (R. 109.)

---

[21] Spasticity is a "disorder[] of muscle movements marked by increased muscle tone, spasm, and loss of skill in muscle use."  4-14 Attorneys' Textbook of Medicine P.14.70, 14.73 (3d ed. 2006.)

[22]The Babinski sign refers to extensor plantar reflexes in the foot.  11-85 Attorneys' Textbook of Medicine P 85.40.

In April of 2002, Dr. Scott-Okafor treated Plaintiff in the rehabilitation clinic on a follow up visit. She noted that Plaintiff had not complied with the recommended course of physical and speech therapy or follow-up visits. (R. 124.) Plaintiff's family members were still providing twenty-four hour supervision. Plaintiff reported taking Oxycontin for back and left upper and lower extremity pain and had obtained additional Oxycontin at Shands despite the recommendation that she taper off use of this medication. Plaintiff claimed only to have occasional weakness although she suffered a fall due to weakness in her left lower extremity. (R. 124.) Plaintiff also claimed she was not sleeping well. Strength was 5/5 throughout with the exception of the left dorsiflexors and EHL which were approximately 4/5. She was able to stand on her toes, but could not walk on them. She had difficulty standing on her heels but that appeared to be secondary to balance problems. She had a positive seated straight leg raise on the left and complained of generalized pain and specific pain in the lumbar region with all movements. Dr. Scott-Okafor found that Plaintiff was neurologically stable with vertebral fractures at T11-12 and transverse process fractures with pain at L3, 4, and 5. Plaintiff declined continued cognitive rehabilitation. (R. 125.)

On the request of the Florida Office of Disability Determination and Services, Dr. Lance I. Chodosh performed a consultative evaluation of Plaintiff on September 25, 2002. He noted that Plaintiff had completed tenth grade and was able to read and write fairly well. She was generally able to perform her activities of daily living and self-care independently. She reported difficulty getting out of the bathtub. Her walking was limited by left-sided weakness to one block. Her ability to stand was limited to twenty minutes, but she was able to sit normally. She could not bend extensively at the waist and told the

8

doctor that it hurt to squat. She could only lift objects with her right arm because she had pain in her left arm. She reported normal use of her hands and dexterity, and reported that she was  to drive. Dr. Chodosh also noted Plaintiff suffered from arthritis, back problems, depression, and headaches and had previously had surgery for bilateral hip fractures.[23]  (R. 127.) He also noted she complained of insomnia, nocturnal sweats, memory loss, difficulty concentrating, irritability and moodiness, headaches, indigestion, nausea and vomiting, chest wall pains, swelling in legs and ankles, dysuria,[24] joint pains and stiffness, and heat intolerance.[25]

Dr. Chodosh specifically noted pain on motion of the left shoulder and hip and such other moderate pain which limited the physical functional assessment. Her straight leg raise was negative to ninety degrees. He noted she had fair standing balance and was slightly positive on the Romberg test. Her gait was normal and without assistive device, but she could not walk on her heels or toes or squat and rise. He noted that a separate psychological evaluation would be helpful to document mental and intellectual functioning. Despite complaints of pain with motion of left extremities, the doctor found no muscle atrophy there. His assessment was that Plaintiff was able to see, hear, speak, walk, stand, and sit normally. She could bend, lift, carry, squat, kneel, and crawl, and manipulate objects. She was able to travel, comprehend and follow instructions, and

---

[23] The hip fractures occurred when Plaintiff fell out of a tree in 1990. (R. 158.)

[24] Dysuria is defined as "difficult or painful discharge of urine."  Merriam-Webster's Collegiate Dictionary 361 (10th ed. 2001).

[25] Plaintiff denied some of these symptoms in a January 15, 2003 visit to the Shands Eastside Community Practice. (R. 158.)

relate normally to others. (R. 130.) Plaintiff's range of motion was within normal limits with some reduced range in Plaintiff's left hip. (R. 131.)

An agency physician completed a residual functional capacity assessment in October of 2002. She noted Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, and had unlimited push and/or pull abilities. She noted that Plaintiff could frequently climb a ramp or stairs, but only occasionally climb ladders/ropes/scaffolds. (R. 134.) It was also noted that Plaintiff should avoid concentrated exposure to extreme cold, heat, wetness or humidity, fumes, or other hazards due to balance problems. No other limitations were noted. (R. 136.) The doctor did note that the alleged effects of symptoms and level of pain were inconsistent with the medical evidence. (R. 137.)

A second agency physician, Dr. Reuben E. Brigety, an Ob/Gyn specialist, completed a second residual functional capacity assessment of Plaintiff in March of 2003. His findings were basically the same as those in the prior assessment except that he recommended that Plaintiff be limited to only occasional climbing in all circumstances (R. 186) and noted that Plaintiff should avoid only concentrated exposure to heights. (R. 188.)

In January 2003, Plaintiff visited the Shands Eastside Community Practice and was treated by Sandra Fields Seymour, Ph.D., ARNP. Plaintiff complained of severe headaches which she stated she had since childhood but were occurring constantly in the frontal and parietal areas accompanied by photophobia and phonophobia. (R. 159.) Plaintiff was sent for brain imaging which revealed no abnormalities. (R. 161.)

10

Plaintiff returned to the Eastside Clinic in February of 2003 and March of 2004 and was seen by Dr. Comeau. Dr. Comeau noted Plaintiff's complaints of low back pain and occasional falls in the past six months due to weakness in her left leg. (R. 199, 202.) Plaintiff also complained of daily headaches, but a CT scan performed when she went to the emergency room was negative. (R. 200.) Upon examination, her strength was found to be 5/5 throughout with her grip strength only at 4/5. Dr. Comeau noted Plaintiff's complaints of low back pain upon all movement, difficulty with side bending, Plaintiff's inability to walk on her toes, and difficulty standing on her heels and with balance. Romberg test was negative. No evidence of clonus or spasticity were noted in Plaintiff's bilateral patellar tendons. (R. 200.)

Dr. Comeau prescribed Zomig to help control Plaintiff's headaches and referred Plaintiff to the headache clinic. Dr. Comeau also stated that she discussed referring Plaintiff to the Pain Clinic and for additional physical therapy due to her back pain. (R. 200, 164-65.)

In March of 2003, Plaintiff was examined by Dr. Oscar B. DePaz. She complained of continuous pain and marked on a drawing that her pain was in her left shoulder, her spine from between her shoulder blades to her low back, left hip, and left knee. She also complained of weakness in her left leg which causes her to fall. (R. 204.) Dr. DePaz noted she had an antalgic gait with left leg limp. Plaintiff stated that she believed her back had worsened over time. Upon examination, Dr. DePaz noted positive neuroforaminal compression. (R. 206.)

Dr. DePaz noted during Plaintiff's follow-up visit in April of 2003 that the MRI of Plaintiff's lumbar spine revealed degenerative disc disease most prominent at L5-S1

with mild neuroforaminal narrowing which was greater on the left than on the right due to disc bulge and facet hypertrophy. No focal disc herniations or spinal stenosis were visible.  (R. 207, 209-10.) Dr. DePaz conducted an EMG examination of the muscles in Plaintiff's left lower extremity and the cervical paraspinals. No abnormalities were detected. Dr. DePaz also performed a nerve conduction study with normal results. Based on the results of these studies, Dr. DePaz concluded that Plaintiff had a normal electrophysiological evaluation without evidence of chronic or acute radiculopathy. No L5-S1 dysfunction nor evidence of the sciatic nerve involvement were found. (R. 208.)

### 3.  Plaintiff's Activities of Daily Living and Hearing Testimony

Plaintiff claims that she cannot cook or do other household chores if they require her to stand for a long period, nor can she shop if it requires a lot of walking or required her to lift something heavy. (R. 50, 58, 61-2, 64-65, 90, 155.) She testified that she does not help with the housework and her mother takes care of her children. (R. 236-37.) She can wash dishes, cook, and drive "a little." She claims that she is always in pain and moves more slowly due to back and leg pain. (R. 51, 59, 86, 155, 159.) She can only walk short distances because her left leg becomes weak or the left side of her body becomes numb, causing her to fall often. She has difficulty dressing due to an inability to lift her left arm over her head or bend down to tie her shoes. (R. 51, 58, 84, 94, 23, 239-40.)

Though she spends the majority of time at home watching television or listening to music (R. 155, 238), Plaintiff testified that she cannot sit for long periods without standing due to pain in her back and legs. (R. 239.) She sometimes will go to see her children, but is afraid to get in the car. (R.155.) She does not visit with others much and

her social relationships are strained. (R. 156, 238.) Plaintiff testified, and the record reflects, that she was taking various pain medications, including Oxycodone or Oxycontin and Cyclobenzaprine for back pain, Celebrex for arthritis, Hydrocodone, Ibuprofen, Lortab, and Bayer for pain, and Tylenol, Advil, and Zomig for her headaches. (R. 80, 96, 100, 158, 202-03, 235-36.) Plaintiff also testified that she was returning to physical therapy. (R. 241.)

## C.  Cognitive Abilities and Evidence of Mental Impairment

Dr. Rout noted on November 29, 2001, after Plaintiff's automobile accident, that her mental status functioning had improved and returned to baseline. (R. 105-106.) He recommended an MRI but noted that the CT scans revealed no brain trauma. He noted her mental status appeared to be intact as it pertained to memory and orientation. However, at this time, and throughout Plaintiff's treatment, it was noted that she had a general lack of focus and attention, and an inability to stay on task or complete tasks without verbal or visual cues.[26] (R. 64, 93, 106, 108, 110, 113, 160.) Due to her brain injury, Plaintiff was advised to continue with speech therapy and cognitive rehabilitation to learn compensatory techniques for re-entry into a normal life in the community or work or educational environment.[27] (R. 108-109.) Plaintiff's conversation skills and written expression had improved, and she demonstrated significant cognitive improvement with overall cognitive linguistic functioning, though some moderate to severe deficits were still present. (R. 108, 113, 115-16, 193-94.)

---

[26] It was noted that some of her attention problems appeared "premorbid" or were present prior to the accident. R. 108.

[27] Due to noncompliance with treatment and failure to attend sessions, Plaintiff was discharged from additional rehabilitative therapy. (R. 198.)

It was noted that Plaintiff had moderate to severe deficits in her immediate memory, recent memory, and temporal orientation to both recent and remote memory. Throughout the record, Plaintiff complained of difficulty with her memory, especially with respect to the time of, and immediately following, the accident. (R. 52, 60, 64, 84, 92-94, 109, 124, 159-60, 204-206.)

In April 2002, Dr. Scott Okafor, and in February of 2003, Dr. Comeau, both noted Plaintiff could follow complex commands, but had flat affect. (R. 124, 200.) In September of 2002, Dr. Chodosh noted that Plaintiff was fully oriented with normal speech and appropriate thought content. He also noted that she had a depressed affect (R. 128) and recommended separate psychological evaluation to document her mental and intellectual functioning. (R. 129.) In March of 2003, Dr. DePaz also found Plaintiff to be alert and oriented with a bright demeanor. (R. 206.)

Dr. Andres Nazario performed a consultative mental status examination on Plaintiff on January 9, 2003. He noted that Plaintiff acted independently, coming to the exam by herself on the bus and completing all paperwork on her own. She was cooperative during the interview, with stable mood and appropriate affect. Dr. Nazario noted that Plaintiff said she took regular classes in high school. She did not disclose a history of mental illness. However, she stated she had seen a psychiatrist after the accident, but she did not remember the time she spent at the Shands Rehabilitation Center nor if she was diagnosed with a mental illness. Plaintiff revealed that she was depressed and had difficulty sleeping because she thought about the car accident often. She also told Dr. Nazario that she cries at times when she visits her kids and cannot do

14

things with them that she used to do. She also felt anxious about her situation and became angry often.[28] She said she was sometimes happy and not suicidal.

Dr. Nazario noted that Plaintiff was oriented to person, place, and time and her recent and remote memory were intact. She was able to recall basic information and perform most of a series of mental status tests without error or difficulty. She had difficulty repeating a five digit sequence forward, missing two of the digits. She was able to repeat a four digit sequence backwards. She was able to concentrate during the interview though she often rubbed her head and rolled her eyes as if in pain. She was persistent in approach and her pace appeared adequate. He noted no evidence of hallucination, word finding difficulties or aphasia,[29] or speech impediment. Dr. Nazario also noted that Plaintiff appeared of above average intelligence, and seemed to have good judgment and insight. Dr. Nazario diagnosed Plaintiff with Post Traumatic Stress Disorder[30] and recommended that Plaintiff receive "psychological intervention" to help her cope with the trauma after her accident. Despite memory loss of events before and after the accident, he noted she had recovered fairly well cognitively.  (R. 157.) He

---

[28] *See also* R. 124, 52, 63, 92.

[29] Aphasia is the "loss or impairment of the power to use or comprehend words usually resulting from brain damage." Merriam-Webster's Collegiate Dictionary 53 (10th ed. 2001.)

[30] The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") defines Post Traumatic Stress Disorder as "the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury . . . . The person's response to the event must involve intense fear, helplessness, or horror . . . .The characteristic symptoms resulting from the exposure to the extreme trauma include persistent reexperiencing of the traumatic event, persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness . . . . The full symptom picture must be present for more than 1 month, and the disturbance must cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. American Psychiatric Association, DSM-IV 463 (4th ed. 2000).

stated that she appeared able to manage her own finances. Plaintiff was able to understand and follow directions and interact with others appropriately.  (R. 157.)

Val J. Bee, Psy. D., completed a psychiatric review of Plaintiff for the agency. She noted that Plaintiff had an organic mental disorder and anxiety-related disorders. (R. 166.) Memory impairment was noted due to the head injury Plaintiff suffered as a result of her accident. (R.167.) As to her anxiety-disorder, it was noted that Plaintiff had recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. (R. 171.) Val J. Bee noted that Plaintiff had mild restriction on her activities of daily living, mild restriction on difficulties maintaining social functioning, moderate difficulty in maintaining concentration, persistence or pace, and no episodes of decompensation. (R.1 78.)

Val J. Bee also completed a Mental Residual Functional Capacity Assessment noting that Plaintiff had moderate limitations on her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to maintain attention and concentration for extended periods. (R. 180.) She noted moderate limitation in Plaintiff's ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was also found to be moderately limited in her ability to set realistic goals or make plans independently of others. (R. 181.)

Val J. Bee noted that given Plaintiff's head injury and subjective complaints, despite the finding by the consultative examiner that Plaintiff's memory was intact, Plaintiff might have problems with detailed learning, and cognitive efficiency and

concentration were also likely decreased. Val J. Bee noted that Plaintiff could meet the mental demands of well structured tasks and appeared "capable of superficially appropriate and cooperative interaction" socially. It was noted that Plaintiff may benefit from goal setting assistance, but her daily adaptive skills were otherwise preserved.  (R. 182-83.)

## V.  DISCUSSION

### A.  Plaintiff's Waiver of Right to Counsel

Plaintiff argues that the ALJ failed to fully apprise her of her right to counsel by not informing her of her options regarding representation. Plaintiff claims that the lack of representation was prejudicial to her claim because had she retained counsel, counsel would have presented evidence that Plaintiff met Listing 12.05C for mental retardation based on an intellectual functioning assessment.

Although there is no constitutional right to counsel at a Social Security hearing, a claimant for social security benefits has a *statutory* right to counsel, which can be waived.[31] The Commissioner must notify the claimant of her right to be represented at the hearing before the ALJ.[32] Waiver of a claimant's right to counsel must be knowing and intelligent.[33] However, the absence of counsel alone does not warrant remand. A claimant must prove unfairness at the hearing or clear prejudice resulting from the

---

[31] Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995)(citing 42 U.S.C. § 406; Smith v. Schweiker, 677 F. 2d 826, 828 (11th Cir. 1882)).

[32] Clark v. Schweiker, 652 F. 2d 399, 403 (5th Cir. 1981). In Bonner v. Prichard, 661 F. 2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[33] Smith v. Schweiker, 677 F.2d 826, 828 (11th Cir. 1982).

absence of counsel before a due process violation is found and a remand will be granted.[34]

Here, Plaintiff received no less than four (4) written notices that advised her of her right to counsel. The notice of reconsideration from the Commissioner dated March 18, 2003 (R. 34 - 35), notified Plaintiff of her right to appeal and request an administrative hearing, and specifically stated that:

> You can have a friend, lawyer, or someone else help you.  There are groups that can help you find a lawyer or give you free legal services if you qualify.  There are also lawyers who do not charge unless you win your appeal.  Your local Social Security Office has a list of groups that can help you with your appeal . . . If you hire someone, we must approve the fee before he or she can collect it.  And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee.

(R.  36.)[35]

A second notice, dated April 22, 2003 (more than one month before the hearing), was included in the acknowledgment of her request for a hearing. (R. 37-38.) The notice specifically stated the following:

### Your Right to Representation

> You may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing. [...]. Some private lawyers charge a fee only if you receive benefits. Some organizations may be able to represent you free of charge. Your representative may not charge or receive any fee unless we approve it. We have enclosed the leaflet "Social Security and Your Right to Representation." We are also enclosing a list of groups that can help you find a representative."

---

[34] <u>Kelley v. Heckler</u>, 761 F. 2d 1538, 1540 (11th Cir. 1985).

[35] The notice of disapproved claim from the Commissioner dated October 18, 2002 (R. 31-32) also advised Plaintiff of her right to appeal and included the same language quoted above.

(R. 37.)

Finally, a third notice of Plaintiff's right to counsel was included on the Notice of Hearing dated May 6, 2004. (R. 21-35.) The notice reminded Plaintiff that she may choose to have a person represent her at the hearing, and directed her to obtain a representative right away if she wanted such representation. (R. 22.)

Plaintiff argues that due to reduced intellectual and cognitive functioning she did not read and understand the notices. However, the Plaintiff testified that her mother read any documents from the Social Security Administration to her, and thus, she had notice of her right to counsel. (R. 230.) In addition to these written notices, the ALJ reminded Plaintiff of her right to counsel and gave her another opportunity to obtain counsel before continuing with the hearing. At the inception of the hearing, the ALJ stated on the record that Plaintiff was without a lawyer. (R. 225.) He stated that Plaintiff had been notified in the Notice of Hearing that she had the right to be represented by a lawyer. (*Id.*)  The ALJ then addressed Plaintiff and said "I want you to understand that you do have the right to have an attorney, if you feel more comfortable with an attorney, . . . if you feel like you're comfortable in presenting the case to me without an attorney, then you can waive your right to representation and go on with the hearing." (R. 225.) He then asked the Plaintiff if she wished to proceed with the hearing and if she wished to waive her right to representation. She responded in the affirmative to both questions.[36] (R. 225-26.)

---

[36] *Cf.* Brown at 935 (citing Cowart v. Schweiker, 662 F.2d 731, 734-35 (11th Cir. 1981)) which held that a claimant's affirmative response to proceed without counsel was not a voluntary waiver in light of further testimony about her unsuccessful attempts to procure representation). In the instant case, there is no evidence that Plaintiff attempted, but failed, to obtain counsel.

In view of the foregoing, the Court concludes that Plaintiff knowingly and voluntarily waived her statutory right to counsel. However, even if the Court were to conclude that Plaintiff did not effectively waive her right to counsel, Plaintiff, nonetheless, has failed to prove that the absence of counsel prejudiced her claim for benefits.

As part of its inquiry into the possible prejudice to Plaintiff, the Court need not determine "that the presence of counsel would necessarily have resulted in specific benefits in the handling of the case before the ALJ."[37] However, there must be a showing of prejudice for a court to conclude that a claimant's right to due process has been violated to such a degree that the case must be remanded.[38] A showing by Plaintiff of evidentiary gaps in the record will suffice.[39] Here, Plaintiff has alleged that in fulfilling his heightened duty to develop the record, the ALJ should have sent the Plaintiff for an intellectual functioning assessment and requested Plaintiff's high school transcript, which would show that she met Listing 12.05C for mental retardation.

It is well-settled that an ALJ has a basic obligation to fully and fairly develop the record.[40] This obligation exists whether or not a claimant is represented by counsel.[41] As

---

[37] Brown at 935 (quoting Clark at 404).

[38] *Id.*

[39] *Id.* at 935-936.

[40] *See* Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); *see also* Zaldivar v. Apfel, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[41] Zaldivar at 1359.

a hearing is non-adversarial in nature,[42] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[43] The Court is mindful that where the right to counsel has not been effectively waived (*i.e.*, was not a knowing and intelligent waiver), the ALJ's basic obligation "rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appears before him."[44]

Plaintiff has attached to her brief a general intellectual evaluation by Rodney Poetter, Ph.D (which was conducted after this case was filed) as support for her argument that she would have met Listing 12.05C had the ALJ sent Plaintiff for intellectual assessment.[45] However, even if this testing would have been presented to the ALJ Plaintiff still would not have met Listing 12.05C for mental retardation. To meet Listing 12.05C, the Plaintiff must demonstrate that she suffered from mental retardation or a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22" <u>and</u> that she has "[a] valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional significant work-related limitation of function."[46]

---

[42] *Id.*

[43] *See* <u>Mason v. Barnhart</u>, 63 Fed. Appx. 284, 2003 WL 1793283, *2 (9th Cir. 2003).

[44] <u>Cowart</u> at 735 (quoting <u>Clark</u> at 404).

[45] Doc. 15, Ex. A.

[46] 20 C.F.R. Part 404, App. 1, Subpart P (emphasis added).

Dr. Poetter administered the Wechsler Adult Intelligence Scale-III and determined that Plaintiff had a verbal IQ of 67, a performance IQ of 65, and a full scale IQ of 64. To determine if Plaintiff's low scores represented a chronic cognitive deficit or were the result of a recent incident, such as the brain trauma Plaintiff suffered from the automobile accident, Dr. Poetter also administered the Wide Range Achievement Test which requires reliance on old learning and is resistant to change in the absence of severe brain trauma. On this test, Plaintiff scored a 73 which placed her at the fourth percentile, or fourth grade level, and which Dr. Poetter stated was consistent with her results on the IQ test.[47]

While Plaintiff's IQ scores place her in the mild range of mental retardation, this score alone does not establish that she suffered from such cognitive deficits prior to age 22. It also does not evidence that Plaintiff met the other criteria of Listing 12.05C, which require more than mild deficits in Plaintiff's functioning. Plaintiff told Dr. Poetter and Dr. Andres Nazario that she took regular classes in high school. The high school transcript for eighth and nine grade, filed by Plaintiff, does not support Plaintiff's claim of mental retardation because there is no designation that any of the classes were "special education" courses. Moreover, Plaintiff's poor grades are also not determinative of mental retardation.[48] Although Plaintiff grades in eighth and ninth grade were marginal

---

[47] *Id.*

[48] Notably, Plaintiff's transcript reflects a another reasons for poor grades. The transcript reflects that in eighth grade she missed fifty days of classes and only attended 130 days. In the 1991-1992 school year, during which Plaintiff attended ninth grade, she missed seventy-one days of classes and during the 1992-1993 school year, where it appears Plaintiff repeated the ninth grade, she missed eighty-three days of class. Far from demonstrating with certainty that Plaintiff suffered from mental retardation, the transcript raises additional questions about Plaintiff's academic career and possible reasons for Plaintiff's poor performance. Doc. 15, Ex. B at 2.

at best, there is no evidence that her grades for previous years were so poor that she was unable to progress. Indeed, it is evident that Plaintiff scored high enough on her grades to pass kindergarten through the seventh grade. She may not have passed with stellar marks, but the fact that she was promoted from one grade to the next does not support Plaintiff's claim that she had a developmental disability prior to age twenty-two.

In fact, Dr. Nazario stated that Plaintiff appeared of above average intelligence during his psychological evaluation. He found that Plaintiff could recall basic information, concentrate, was persistent, and performed most mental status tests without error, although she had difficulty repeating a five digit sequence.

Despite Plaintiff's low IQ, there is nothing else of record to establish that Plaintiff met the other requirements of Listing 12.05C.  Therefore, even if Plaintiff was represented by counsel, and counsel submitted an intellectual evaluation, including the results of an IQ test consistent with the evaluation by Dr. Poetter, there was no prejudice because she still would have failed to meet Listing 12.05C.  Moreover, the ALJ held the record open for two weeks after Plaintiff's hearing to afford Plaintiff with an opportunity to submit updated medical evidence. Despite the fact that Plaintiff did not always keep the consultative appointments ordered by the agency,[49] she had ample opportunity to supplement the record. The absence of counsel did not affect the ALJ's determination of the Plaintiff's RFC, nor prejudice Plaintiff with regard to establishing that she met a Listing. Accordingly, Plaintiff has failed to establish that the lack of representation prejudiced her ability to establish her claim for disability.

---

[49] R. 27-28.

## B.  Headaches, Degenerative Lumbar Disorder, Subjective Complaints of Pain

Plaintiff argues that the ALJ erred at step two of the sequential analysis by not finding Plaintiff's headaches and degenerative lumbar disorder were "severe."[50] Plaintiff also contends that the ALJ erred in failing to consider Plaintiff's degenerative lumbar disorder and headaches in his analysis of Plaintiff's RFC or and that the ALJ failed properly to consider Plaintiff's subjective complaints of pain under the Eleventh Circuit pain standard.

With respect to Plaintiff's first argument, the ALJ does not need to find all of Plaintiff's impairments severe at step two to proceed with the sequential analysis and go on to step four and make a RFC determination. At step two, the ALJ only needs to find that the individual has at least one impairment which affects her ability to perform basic work activities.[51] The burden is upon the Plaintiff to establish that she has a severe impairment, but such a threshold is minimal and easily met.[52] The ALJ must then take any other impairments into account when determining Plaintiff's RFC at step four. Here, the ALJ found that the Plaintiff's status post motor vehicle accident with spinal injury, traumatic brain injury, and post traumatic stress disorder were "severe" at step two, and it is not reversible error that the ALJ did not make a step two severity finding as to

---

[50] Doc. 15 at 14.

[51] 20 C.F.R. §§ 416.920(c), 416.921(a).  Basic work activities include the following: "1) physical functions such as walking, standing, sitting, lifting, pushing, pulling . . . ; 2) capacities for seeing, hearing, and speaking; 3) understanding, carrying out and remembering simple instructions; 4) use of judgment; 5) responding appropriately to supervision, co-workers and usual work situation; and 6) dealing with changes in a routine setting.  20 C.F.R. § 416.921(b ); *see also* Stokes v. Apfel, No. CA 97-1200-BH-C, 1998 U.S. Dist. LEXIS 16475, at *4 (S.D. Ala. 1998).

[52] McDaniel v. Bowen, 800 F.2d 1026, 1031(quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).

Plaintiff's headaches or degenerative lumbar spine disorder. However, by finding that Plaintiff had a severe impairment with respect to Plaintiff's status post motor vehicle accident with spine injury, it appears that the ALJ considered the severity of Plaintiff's back or spine injury although he did not use Plaintiff's terminology and label it a "lumbar spine disorder."

Plaintiff also contends that the ALJ erred by failing to properly consider Plaintiff's subjective complaints of pain. In the Eleventh Circuit, the ALJ must "consider a claimant's subjective testimony of pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of such a severity that it reasonably can be expected to give rise to the alleged pain.[53] The ALJ may reject the plaintiff's subjective pain testimony, but the decision must be supported by substantial evidence.[54] Moreover, if the ALJ rejects a claimant's testimony of pain on credibility grounds, the ALJ must discredit it explicitly, and articulate the reasons for doing so.[55]

At step four, the ALJ stated that he considered Plaintiff's subjective complaints of pain, daily activities, medical source opinions, and Plaintiff's medication. The ALJ did not explicitly state which underlying medical condition he found might cause Plaintiff's pain, but proceeded to evaluate the medical evidence of her pain in light of his prior finding of Plaintiff's severe impairments and his summary of all of the medical evidence

[53]Foote, 67 F.3d at 1560.

[54]Id.

[55]Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

25

on record. Such evaluation took into account Plaintiff's motor vehicle accident with spinal injury, traumatic brain injury, post traumatic stress disorder, as well as Plaintiff's subjective complaints of pain, such as her headaches. The ALJ proceeded to discuss the medical evidence as it related to the intensity, persistence, and specifically, the functional limitations that such pain might impose on Plaintiff.

The ALJ first noted that after her accident, Plaintiff made significant progress in her recovery and was discharged from the hospital one month after her accident. He noted that Plaintiff can perform independently various activities of daily living and despite complaints of leg pain, electrophysiologic testing performed in 2003 by Dr. DePaz revealed normal results. The ALJ also noted that although Plaintiff appeared distracted by pain, Dr. Nazario concluded that Plaintiff was able to concentrate, and had good persistence and pace during the evaluative interview. Lastly, the ALJ noted that Plaintiff often failed to follow-up for treatment with her doctors, but none of her treating physicians placed any limitations on her physical abilities which would prevent her from performing basic work activities.

Additional evidence in the record supports the AJL's conclusion that Plaintiff's complaints of pain were not as disabling as she claimed. Dr. DePaz noted neuroforaminal compression and that an MRI of Plaintiff's lumbar spine revealed degenerative disc disease which was most prominent at L5-S1 with mild neuroforaminal narrowing due to a disc bulge and facet hypertrophy. However, no disc herniations or spinal stenosis were visible on the MRI. He performed the aforementioned electrophysiological evaluation and an EMG examination, both with normal results. Dr. Chodosh noted Plaintiff had some pain on movement of Plaintiff's left hip and shoulder,

26

but he found she could walk, stand, and sit normally, as well as bend, lift, carry, squat, kneel, and crawl. Dr. Comeau found Plaintiff's strength to be 5/5 throughout with a grip strength of 4/5. She noted Plaintiff complained of low back pain with movement and had difficulty bending to the side. She prescribed medication for Plaintiff's back pain and headaches and recommended physical therapy to help Plaintiff relieve her back pain. While the Plaintiff testified that she does not help with housework and her mother takes care of her children, in prior records, and at her hearing, Plaintiff testified that she could cook, drive, and wash dishes "a little," as long as she did not have to stand or walk for extended periods of time.

Although the ALJ did not specifically discuss the Plaintiff's headaches in his RFC analysis, the ALJ noted in his discussion of the record that Plaintiff reported she had headaches to Dr. Chodosh, Sandra Fields Seymour, Ph.D., a nurse practitioner, and Dr. Crystal Comeau, but a CT scan of her head revealed no abnormalities and that she took medication for pain. The record discloses that Dr. Comeau prescribed Zomig to Plaintiff for severe headaches, but recommended she take Ibuprofen for less severe headaches. Dr. Comeau also referred Plaintiff to the Headache Clinic, but there is no evidence in the record with respect to whether Plaintiff visited this clinic. The ALJ did not need to discuss Plaintiff's headaches in more detail because the substantial evidence in the record does not show that Plaintiff's headaches interfered with her ability to do basic work activities, nor that she continually sought treatment for this condition.

The ALJ properly took into account Plaintiff's subjective complaints of pain, including her headaches, when he evaluated and discredited such complaints under the Eleventh Circuit pain standard. As a result, the ALJ did not commit reversible error in his

27

determination of Plaintiff's RFC and in concluding that Plaintiff could perform sedentary

work because he considered Plaintiff's back condition, headaches, and complaints of

pain in light of the substantial evidence in the record.

## VI.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the

Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly and

close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 27, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel

28